William A. Richards #013381
Gideon Esakoff #037490
**RICHARDS & MOSKOWITZ PLC**
1850 North Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone No. 602-595-7800
Facsimile No. 602-595-7800
E-mail: brichards@RMazlaw.com
        gideon@RMazlaw.com

Andrew Rozynski (Pro Hac Vice to be Filed)
**EISENBERG & BAUM, LLP**
24 Union Square East, Penthouse
New York, NY 10003
Telephone No. 212-353-8700
Facsimile No. 212-353-1708
E-mail: arozynski@EandBLaw.com
*Attorneys for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alison Mayfield, an individual, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| City of Mesa, a municipality; Mesa Police Department Officer M. Hall, #23213, an individual; Mesa Police Department Officer Van Hilsen, #23547, an individual; Mesa Police Department Officer Voeltz, #23534, an individual; Doe Defendants 1-10, | |
| Defendants. | |

Plaintiff Alison Mayfield ("Alison") alleges:

<u>THE ACTION</u>

1.  This is a civil action under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and 42 U.S.C. § 1983. Alison seeks full relief and compensation

for all past, present, and future losses and harms caused to Alison by any of the Defendants' actions and omissions alleged in this Complaint, including those: 1) undertaken by any of the Defendants under color of law with the intent and for the purpose of depriving Alison of any right secured by the Constitution or the laws of the United States; and/or 2) that involve any of the Defendants refusing or neglecting to prevent the rights deprivations and denials asserted in this Complaint.

2. The City of Mesa (the "City") is sued as a result of the actions or omissions of its agents, including Mesa Police Department ("MPD") Officers M. Hall, Van Hilsen, and Voeltz, as alleged herein, all of which occurred within the scope of each such agent's authority and work for the City, and all of which were either caused or ratified by the City.

3. Officer M. Hall learned that Alison was Deaf immediately after pulling over her car on the evening of January 1, 2022. Alison immediately and repeatedly requested an American Sign Language ("ASL") interpreter. Defendants denied her requests in violation of anti-discrimination statutes and Alison's rights.

## PARTIES, JURISDICTION, AND VENUE

4. Alison is, and at all relevant times has been, an individual residing in Maricopa County, Arizona. Alison is profoundly Deaf and communicates in ASL. She is substantially limited in the major life activities of hearing and speaking, and qualifies as a disabled person within the meaning of the ADA and the RA. Alison requested and was denied a reasonable accommodation for her disability to facilitate effective communication between herself and Defendants during a traffic stop, detention, and arrest on or about January 1, 2022.

5. The City is a municipality, organized and operating pursuant to the laws of the State of Arizona. The City is a governmental entity and acted through its agents at all times relevant to the claims in this Complaint. On information and belief, the agents of the City whose actions and omissions form the basis for Alison's claims were acting at all material times with the City's consent and authorization, and according to the City's training, customs, policies, or practices. The City is a recipient of federal financial assistance subject to the

1  requirements of the RA.

2  6. The MPD is a department of the City that operates through its employees. Because the MPD is a department of the City, and the City has authority to direct the policies and customs implemented by the employees within its departments, it is liable for the actions of the MPD and its agents that form the basis of Alison's claims.

7. Officer M. Hall, Badge #23213, was employed as an officer of the MPD on or about January 1, 2022, and at all times relevant to this Complaint. On information and belief, Hall is, and at all relevant times has been, a resident of Arizona.

8. Officer Van Hilsen, Badge #23547, was employed as an officer of the MPD on or about January 1, 2022, and at all times relevant to this Complaint. On information and belief, Hall is, and at all relevant times has been, a resident of Arizona.

9. Officer Voeltz, Badge #23534, was employed as an officer of the MPD on or about January 1, 2022, and at all times relevant to this Complaint. On information and belief, Voeltz is, and at all relevant times has been, a resident of Arizona.

10. Doe Defendants 1-10 are individuals, corporations, limited liability companies, and other entities (collectively, the "Fictitiously-Named Defendants"), whose true names and identities are not known to Alison, and who are liable, jointly and severally with the named Defendants, for the transactions, agreements, acts, and omissions alleged in this Complaint, as joint tortfeasors, co-conspirators, alter egos, or otherwise. Alison reserves the right to amend this Complaint to identify any of the Fictitiously-Named Defendants whose identity becomes known to her.

11. Jurisdiction and venue are proper in this Court.

12. Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction with respect to claims arising under Section 504 of the RA, 29 U.S.C. § 794, and Title II of the ADA. 42 U.S.C. §§ 12181, *et seq*.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the acts and omissions giving rise to the alleged causes of action occurred in this District.

# GENERAL ALLEGATIONS

*<u>When Officer Hall pulls Alison over, Alison immediately informs her she is Deaf and requests an ASL interpreter. Officer Hall does not comply with Alison's request, despite acknowledging the need for an ASL interpreter.</u>*

14. Alison realleges all other allegations in this Complaint.

15. Alison is a profoundly deaf individual who communicates through ASL. She lost hearing in both ears when she was just eight months old due to nerve damage caused by spinal meningitis, and has been diagnosed with a progressive bilateral sensorineural hearing loss. In other words, the permanent nerve damage to both ears resulted in a severe to profound hearing loss that impacts Alison's ability to hear high and mid-range frequencies. Without assistive hearing devices, she is unable to hear speech sounds at all.

16. Alison has worn assistive hearing devices since she was three years old. She is able to communicate verbally only with a quality assistive hearing device. At the time of the traffic stop, however, she was wearing one assistive hearing device in her left ear, which was donated to her and was not a high-quality device. The assistive hearing device proved to be of little use especially because of the wind and other outside noises that eliminated the potential benefit of wearing an assistive hearing device. Alison therefore was forced to communicate through some written communications and by attempting to read MPD Officers' lips during the night-time traffic stop on a poorly-illuminated street.

17. To alleviate the symptoms associated with vertigo and debilitating migraines, Alison legally uses marijuana. On January 1, 2022, Alison used marijuana at 8:00 a.m., and candidly informed Officer Hall of this when asked. More than thirteen hours later, at approximately 9:45 p.m., Alison was driving home in Mesa, Arizona, when she was pulled over by Officer Hall, who was wearing her MPD-issued body camera. Officer Hall approached Alison's driver's side door, and Alison informed Officer Hall of her disability. She immediately began communicating in ASL, and requested an ASL interpreter.

18. Officer Hall understood at once that Alison is Deaf. Officer Hall attempted to communicate with Alison by talking at her, through sporadic (and incorrect) letter-signing,

and by intermittently typing messages using her cell phone. But even Officer Hall recognized these methods were not conducive to the level of communication afforded to a similarly-situated hearing individual. Approximately five minutes into their interaction, Officer Hall can be heard on the bodycam footage inquiring, "Do we have anyone [with] sign language?"

19. Officer Hall can also be heard requesting a "sign language" officer to assist her, but adds that if the dispatcher she is speaking with cannot find a "sign language" officer assist, she will "just take a regular 906," referring to an assisting officer who is not fluent in ASL.

20. Officer Hall proceeded to write down multiple commands and a question about a pat down on a notepad, and showed it to Alison. Alison attempted to communicate with Officer Hall through ASL upon exiting her vehicle, and again reiterated her request for an ASL interpreter. Officer Hall repeats "okay" but does not say anything indicating she understands the substance of Alison's communication. To the contrary, when Officer Van Hilsen arrived, Officer Hall admitted, "I don't know sign language so might be a little slow," as Alison walked ahead of the Officers toward the sidewalk, with her back to the Officers.

21. Officer Hall assured Alison she would procure an interpreter. Just minutes later, Officer Hall informed Alison that no interpreter was available. For the duration of their nearly three-hour interaction, MPD Officers deliberately disregarded Alison's repeated requests for an accommodation as they conducted a traffic stop; performed field testing; arrested her; placed her in handcuffs; transported her to a DUI processing facility; performed a blood draw; provided a written *Miranda* warning; and processed her, all without the aid of a certified ASL interpreter or any other reasonable accommodation.

22. Officer Hall informed Alison that she pulled her over for "weaving." Alison informed the officer that her car pulls to the left and that she had been struggling with mechanical issues.

23. At the time of the traffic stop, Alison was sober, and exhibiting no signs of inebriation.

A. <u>Having acknowledged the need and their duty to provide an interpreter, Officers deny Alison's request for one, and immediately put her through extensive sobriety field and blood testing.</u>

5

24. While Alison sat in her car, Officer Hall attempted to communicate by text message exchange and by letter-signing, which included multiple errors, requiring Alison to try to guess correctly which word Officer Hall was attempting to spell. Neither method was effective.

25. When Officer Van Hilsen arrived, Officer Hall directed Alison to exit her car and ordered her to perform sobriety testing. Officer Hall delivered the instructions for these tests to a suspect she knew was Deaf vocally and by showing her some written instructions, which Alison was expected to read and comprehend despite the small print, lack of illumination, and stressful circumstances. The lack of an interpreter denied Alison the opportunity to understand the instructions to the tests. Alison could understand the Officer's instructions only partially. Alison maintains only a limited ability to read lips, which was additionally hampered by low visibility because the traffic stop occurred at night. At one point, Officer Van Hilsen even pointed out there are "zero street lights over here," referring to where Officer Hall was conducting field sobriety tests, to which Officer Hall responded that she did not want to go to a busier street. In addition, when Officer Van Hilsen asked Officer Hall if Alison could read lips, despite considerable evidence to the contrary, Officer Hall confidently proclaims, "pretty well, yeah."

26. Alison did her best to comply with Officer Hall's instructions despite her deafness, and despite the fact that her disability made it difficult for her to understand and comply with the instructions. At one point as Alison was attempting to read written sobriety test instructions, Officer Hall abruptly lowered the clipboard to which the instructions were attached, and proceeded to verbally instruct Alison in addition to using her limited, and often incorrect, letter signing.

27. The written instructions for one of the field sobriety tests required counting out loud. When Alison attempted to explain she was unable to perform this aspect of the test, Officer Hall translated Alison's ASL as "you're saying . . . about counting? It's okay, it's okay, I understand. You just do your best with the counting, I understand." Whether – or the extent

to which – Officer Hall actually understood Alison's communications remains unclear, because Alison was denied the benefit of a qualified ASL interpreter or another reasonable accommodation.

28.   Alison's performance on the field sobriety tests was also hampered by balance issues caused by her vertigo, a condition related to her disability. The fact that it was approximately 48 degrees Fahrenheit outside, and her dire need to use the restroom, further interfered with her ability to perform the field sobriety tests. Alison attempted to communicate each of these factors to the Officers. They ignored her.

29.   Officers placed Alison under arrest at approximately 10:18 p.m., handcuffed her, and transported her in the back of a patrol car to MPD's DUI processing facility. After handcuffing her and while standing in an unlit street, Officer Hall told Alison "I'll explain as much as I can," acknowledging the lack of effective communication. When Alison attempted to communicate through ASL while handcuffed, Officer Hall is heard saying, "Tell me again, I don't understand."

30.   Officer Hall assured Alison that an MPD officer fluent in ASL would meet her for processing, but this was not what occurred.

B. _Alison is interrogated, drug tested, Mirandized, and charged – all without the aid of an ASL interpreter, as Officers ignore her repeated requests for one. They never provide any means of effective communication, despite their acknowledgement of the need for one._

31.   At the DUI processing facility, Alison once again requested an interpreter. She was once again told that none was available. The Officers never provided any effective means of communication. Instead, like Officer Hall, Officer Voeltz attempted to communicate a few times in ASL, but was incapable of communicating effectively in ASL. As a result, Alison did not understand what Officer Voeltz was attempting to sign. Officer Voeltz called his mother on his personal cell phone, claiming she could communicate in ASL. Alison attempted to communicate with Officer Voeltz's mother, but was unable to do so effectively. The exchange did not last long before Officer Voeltz ended the call.

32.   MPD, through its officers, never provided Alison a qualified ASL interpreter or

RICHARDS & MOSKOWITZ
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone 602-595-7800

made any type of accommodation available to her at any time throughout their interactions. MPD, through its officers, failed to ensure effective communication with Alison during critical arrest and post-arrest proceedings.

33. Officers caused Alison's car to be towed from the traffic stop location, and she subsequently incurred expenses to retrieve her car from the impound yard.

34. Officers and MPD caused Alison's blood to be drawn upon arrival at the police station, without providing her an ASL interpreter. Prior to the blood draw, Officer Voeltz, who is not a qualified ASL interpreter, attempted to translate the Admonitions relating to the Admin Per Se/Implied Consent Affidavit.

35. Officers provided Alison written *Miranda* rights without accommodating her disability.

36. Defendants knew or should have known that their actions and/or inactions created an unreasonable risk of causing Alison greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

37. As a result of Defendants' failure to ensure effective communication with Alison, she received services that were objectively substandard and inferior to those provided to hearing individuals, and thus, was subjected to discriminatory treatment because of her disability.

38. The City knew of its obligation to train its officers to secure ASL interpreters during critical interactions with suspects and arrestees, such as during arrests and post-arrest procedures, and its failure to train its officers in the importance of utilizing ASL interpreters evidences the City's deliberate indifference to the well-established constitutional rights of deaf citizens—including the right to be free from unreasonable searches and seizures, to equal protection under the law, and to due process—as well as its deliberate indifference to ensuring officers' compliance with the ADA, the RA, and the Fourth and Fourteenth Amendments.

39. The City demonstrated through its agents' interactions with Alison that MPD's officers are not properly trained on how to interact with deaf or hearing-impaired individuals,

and that this failure results in significant communication breakdowns.

40. Defendants' wrongful and intentional discrimination against Alison on the basis of her disability is the byproduct of the City's failure to train its employees and agents, and its failure to require adherence to MPD's policies designed to prevent discrimination against deaf and hearing-impaired individuals.

41. In connection with the criminal charges arising out of Alison's arrest, her driver license has been suspended for 90 days. The suspension has prevented Alison from transporting herself to her job, and to chiropractor appointments, which she previously attended weekly to help manage her migraines. Due to the expense of private transportation, Alison has had no choice but to rely on public transportation. Traveling to the nearest chiropractor's office takes approximately three hours due to multiple bus transfers, assuming the city buses are on time. Without the ability to continue receiving care to help treat her health condition, Alison has experienced an increase in the frequency and severity of her migraines. Her commute time to work increased from twenty minutes to one hour and fifteen minutes to one hour and thirty minutes, provided public transportation is not delayed, and requires her to walk three miles – the distance to the closest bus stop. Additionally, Alison's ability to visit friends and family who live across town has become severely limited, especially because public transportation does not reach her parents' residence. Alison has felt vulnerable and unsafe using public transportation, and therefore has limited her use of public transportation as much as possible. For example, she rescinded her application to participate in the Phoenix Festival of the Arts anticipating the event to coincide with the license suspension, and has withdrawn from marketing and networking events relating to her work as a freelance graphic designer. The amount of freelance work offered to Alison, and corresponding income, has predictably diminished. In addition to the adverse physiological effects due to the inability to continue with migraine management, the isolation caused by the license suspension has had a detrimental impact on Alison emotionally and mentally, and will continue to do so until the ninety-day suspension concludes. The suspension has compounded the stress, anxiety, and

emotional distress stemming from the January 1, 2022 traffic stop and arrest, and their aftermath.

## COUNT I

### Violation of the ADA – Against the City

42. Alison realleges all other allegations in this Complaint.

43. At all times relevant to this action, Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, has been in full force and effect and has applied to Defendants' conduct.

44. At all times relevant to this action, the United States Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to the Defendants' conduct.

45. At all times relevant to this action, Alison has been substantially limited in the major life activities of hearing, and is considered an individual with a disability as defined in the ADA, 42 U.S.C. § 12102(2).

46. Defendants are public entities as defined under Title II of the ADA, 42 U.S.C. § 12131(1).

47. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

48. Federal Regulations implementing Title II of the ADA state that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

49. Federal Regulations implementing Title II of the ADA state that a public entity "shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

50. Federal Regulations implementing Title II of the ADA state that a public entity "shall furnish appropriate auxiliary aids and services where necessary," and "in order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b).

51. Title II of the ADA states that auxiliary aids and services include, but are not limited to, "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12103.

52. Federal Regulations implementing Title II of the ADA provide examples of other effective methods of accommodation, such as qualified interpreters on-site or through video remote interpreting (VRI) services; real-time computer-aided transcription services; written materials; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; and videotext displays. 28 C.F.R. § 35.104.

53. When determining what type of auxiliary aid and service is necessary, "a public entity shall give primary consideration to the requests" of the individual with the disability. 28 C.F.R. § 35.160(b)(2).

54. Federal Regulations implementing Title II of the ADA state that a public entity "shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication" except in an emergency or when the individual with a disability specifically requests the accompanying adult to interpret. 28 C.F.R. § 35.160(c).

55. Defendants discriminated against Alison on the basis of disability by excluding her from participation in and denying her the benefits of their services, and by subjecting her

to discrimination, in violation of the ADA.

56. Defendants further discriminated against Alison by failing to ensure effective communication through the provision of a qualified in-person interpreter.

57. Defendants' failure to provide effective communication to Alison denied her the same access to Defendants' services, benefits, activities, programs, or privileges as the access provided to hearing individuals.

58. Defendants further discriminated against Alison by failing to train their employees to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the ADA.

59. Defendants' violation of Alison's rights under the ADA caused her to suffer from discrimination, unequal treatment, and exclusion.

60. Further, Title II of the ADA incorporates the remedies set forth in 29 U.S.C. § 794a of the RA. 42 U.S.C. § 12133.

61. In turn, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

62. Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

63. As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights"

12

not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

64. 42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

65. Alison is also entitled to other forms of compensatory damages beyond emotional-distress damages because Defendants are subject to remedies traditionally available in suits for breach of contract. "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Rest. (Second) of Contracts § 347 cmt. A (Am. L. Inst. 1981). Here, when citizens like Alison interact with public entities like Defendants, they expect that they will be able to communicate with the public officials throughout the interactions.

66. Accordingly, Alison had an expectation interest in the ability to fully participate in her own criminal proceedings, such as the investigation, arrest, booking, detainment, arraignment, release, court proceedings, and probation. Defendants denied Alison this expectation interest by denying her the opportunity to be informed about and participate in her criminal proceedings. Accordingly, she should be entitled to compensatory damages under her expectation interest.

67. Alison is also entitled to damages for dignitary harm. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (concluding that a "past injury" includes a defendant's "discriminatory failure to ensure effective communication"). "There is no doubt that dignitary harm is cognizable; stigmatic injury is 'one of the most serious consequences' of discrimination." *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833–34 (7th Cir. 2019) (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)). "A plaintiff personally denied equal treatment by the challenged discriminatory conduct has suffered a concrete injury . . . ." *Id.* at

834 (cleaned up). Thus, Alison should be entitled to damages for dignitary harm. *See Shaver v. Indep. Stave Co.*, 350 F.3d 716, 724 (8th Cir. 2003) ("[T]he mere fact of discrimination offends the dignitary interest that [civil rights laws are] designed to protect, regardless of whether the discrimination worked any direct economic harm to the plaintiffs.").

68. The City, through the MPD, further discriminated against Alison by failing to train its officers to accommodate disabled individuals, and failing to modify discriminatory practices and procedures, as required by the ADA.

69. Defendants' violations of Alison's rights under the ADA caused her to suffer from discrimination, unequal treatment, and exclusion.

70. Alison is therefore entitled to compensatory damages for the injuries and loss sustained as a result of Defendants' deliberate indifference of her rights under the ADA, as well as an award of attorneys' fees, costs, and disbursements, pursuant to the ADA. *See* 42 U.S.C. § 12133.

## COUNT II

### Violation of the RA – Against the City

71. Alison realleges all other allegations in this Complaint.

72. At all times relevant to this action, Section 504 of the RA, 29 U.S.C. § 794, was in full force and effect, and applied to Defendants' conduct.

73. At all times relevant to this action, Alison has had substantial impairment to the major life activities of hearing and speaking within the meaning of 45 C.F.R. § 84.3(j), and therefore qualifies as an individual with a disability as defined in 29 U.S.C. § 708(20)(B).

74. Pursuant to Section 504 of the RA, "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

75. 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection

14

(e)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title."

76. Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000e-5(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

77. As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

78. 42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

79. Plaintiff is also entitled to other forms of compensatory damages beyond emotional-distress damages because Defendants are subject to remedies traditionally available in suits for breach of contract. "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Rest. (Second) of Contracts § 347 cmt. A (Am. L. Inst. 1981). Here, when citizens like Alison interact with public entities like Defendants, they expect that they will be able to communicate with the public officials throughout the interactions.

80. Accordingly, Alison had an expectation interest in the ability to fully participate

15

in her own criminal proceedings, such as investigation, arrest, booking, detainment, arraignment, release, court proceedings, and probation. Defendants denied Alison this expectation interest by denying her the opportunity to be informed about and participate in her criminal proceedings. Accordingly, Alison should be entitled to compensatory damages under his expectation interest.

81. Alison is also be entitled to damages for dignitary harm. *See Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (concluding that a "past injury" includes a defendant's "discriminatory failure to ensure effective communication"). "There is no doubt that dignitary harm is cognizable; stigmatic injury is 'one of the most serious consequences' of discrimination." *Carello v. Aurora Policemen Credit Union*, 930 F.3d 830, 833–34 (7th Cir. 2019) (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)). "A plaintiff personally denied equal treatment by the challenged discriminatory conduct has suffered a concrete injury . . . ." *Id.* at 834 (cleaned up). Thus, Plaintiff should be entitled to damages for dignitary harm. *See Shaver v. Indep. Stave Co.*, 350 F.3d 716, 724 (8th Cir. 2003) ("[T]he mere fact of discrimination offends the dignitary interest that [civil rights laws are] designed to protect, regardless of whether the discrimination worked any direct economic harm to the plaintiffs.").

82. Defendants discriminated against Alison on the basis of her disability by denying her meaningful access to the services, programs, and benefits provided by Defendants to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication with Alison, in violation of Section 504 of the RA.

83. Defendants further discriminated against Alison by failing to ensure effective communication through the specific provision of a qualified, in-person interpreter.

84. The City, through the MPD, further discriminated against Alison by failing to train its officers to accommodate disabled individuals and failing to modify discriminatory practices and procedures, as required by the RA.

85. Alison is entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct, as well as an award of

16

attorneys' fees, costs, and disbursements, pursuant to the RA. *See* 29 U.S.C. § 794.

## COUNT III

### Wrongful Arrest under ADA and RA – Against the City

86. Alison realleges all other allegations in this Complaint.

87. Despite knowing of Alison's disability, Officers subjected Alison to extensive sobriety testing.

88. Alison's disability interfered with her ability both to understand the instructions and to perform the tests. Alison requested an interpreter.

89. On information and belief, Officers misperceived Alison's disability as signs of inebriation or impairment due to illegal drugs, and ignored the impact of her disability on her ability to understand his commands, comply with his instructions, and perform the numerous tests they required of her.

90. Officers arrested Alison due to legal conduct relating to her disability.

91. Alison is entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of the wrongful arrest, as well as an award of attorneys' fees, costs, and disbursements, pursuant to the RA, 29 U.S.C. § 794, and the ADA. 42 U.S.C. § 12133.

## COUNT IV

### 42 U.S.C. § 1983 Violations

92. Alison realleges all other allegations in this Complaint.

93. Officers, while acting under the color of state law, knowingly and intentionally violated Alison's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

94. Defendants' conduct evidences a reckless or callous indifference to Alison's federally-protected rights.

95. MPD Officers knew or reasonably should have known that Alison was disabled, and that the disability manifested in an inability to hear, especially without a quality assistive device, and in difficulty balancing.

17

96. Alison's performance on physical sobriety tests was susceptible to credible explanations that were not compatible with nefarious activities.

97. MPD Officers lacked probable cause to arrest Alison.

98. MPD Officers knowingly violated Alison's well-established constitutional right to due process by depriving her of effective communication during critical arrest and post-arrest proceedings.

99. MPD Officers knowingly violated Alison's well-established constitutional right to equal protection under the law by discriminating against her on the basis of her disability.

100. MPD Officers knowingly violated Alison's well-established constitutional right to be free from an unreasonable search and seizure by arresting her based on the symptoms she exhibited relating to her disability.

101. The City failed either to develop and implement a policy pursuant to federal and state laws and regulations that were enacted to prevent discrimination against disabled individuals, or to train its agents and officers to adhere to anti-discrimination laws and regulations.

102. To the extent an applicable policy exists, the City's failure to train its agents and officers to comply with that policy is compounded by its failure to supervise officers to ensure their adherence to the policy.

103. The City's failure to train and supervise the Officers resulted in their repeated and deliberate conduct in disregarding the constitutional rights of deaf or hard-of-hearing individuals such as Alison by denying requests for a qualified ASL interpreter during arrest and post-arrest procedures.

104. The City's failure to train MPD officers in the importance of utilizing qualified ASL interpreters during interactions that implicate disabled individuals constitutionally-protected rights evidences the City's deliberate indifference to the fundamental rights of deaf citizens to equal protection under the law and to due process.

105. On information and belief, the City knew or should have known that denying

18

effective communication to a suspect and arrestee, despite her known disability and specific requests for an interpreter, would deprive her of the right to effective communication and to due process.

106.   Alison is entitled to an award of punitive damages because Defendants' actionable acts and omissions, as alleged herein, were willful, malicious, intentional, recklessly indifferent, and/or undertaken with an evil mind and motive and with disregard for and deliberate indifference to Alison's legal rights under federal law and the substantial risk of serious and material harm to her.

## PRAYER FOR RELIEF

**WHEREFORE,** Alison requests that this Court grant the following relief against Defendants:

A.   Enter judgment in her favor after finding that Defendants' conduct, practices, policies, and procedures subjected her to discrimination in violation of Title II of the ADA and Section 504 of the RA.

B.   Enter judgment in her favor after finding that Defendants violated Alison's well-established constitutional rights, in violation of 42 U.S.C. § 1983.

C.   Enter judgment in her favor requiring the City to institute a policy of nondiscrimination of Deaf individuals, and requiring the City to train its officers to adhere to the policy.

D.   Award to Plaintiff:

   i.   All appropriate actual and compensatory damages pursuant to the ADA, Section 504 of the RA, and 42 U.S.C. § 1983;

   ii.  To the extent allowed by any applicable law, exemplary or punitive damages in an amount sufficient to punish Defendants for their wrongful conduct, and deter similarly-situated persons or entities from engaging in comparable conduct in the future;

   iii. Reasonable costs and attorneys' fees pursuant to the ADA, Section 504

of the RA, and 42 U.S.C. § 1983;

iv. Interest on all amounts at the highest rate and from the earliest date allowed by law; and

v. Any other relief this Court finds just, necessary, and appropriate, including nominal damages.

## JURY DEMAND

Alison demands trial by jury for all of the issues a jury properly may decide, and for all of the requested relief a jury may award.

RESPECTFULLY SUBMITTED this 30th day of December, 2022.

RICHARDS & MOSKOWITZ PLC

*/s/ William A. Richards*
William A. Richards
Gideon Esakoff
1850 N. Central Avenue, Suite 2010
Phoenix, AZ 85004

AND

EISENBERG & BAUM, LLP
Andrew Rozynski
24 Union Square East, Penthouse
New York, NY 10003

*Attorneys for Plaintiff*